Court of Appeal for the Federal Circuit is now open and in session. I say to the United States and this Honorable Court. Thank you. Good morning, everyone. First, may I say we are very pleased and honored to have with us this morning with the panel, Judge Ronald White of the Northern District of California. Welcome, Judge White. Thank you. First case this morning is number 2009-5121, Arkansas Game and Fish Commission against the United States. Mr. Lundman. May it please the Court, Robert Lundman representing the United States. I would like to and have to begin by saying that this is a case in which the Commission's land was taken, because the change in dam operations led only to a temporary, intermittent, marginal, and unanticipated increase in flooding, even accepting the facts as found by the Court of Federal Claims. The flooding did not invade the Commission's land so as to appropriate it, and at most there  cases in which the taking, whatever you want to call it, was evaded, left no permanent damage behind it. So how do you integrate with the theory that this was just a temporary flooding, the consequences? Well, I think the cases that distinguish between a tort and taking, I think there are cases where, for example, in Sanguinetti, the Supreme Court case held that was not a taking, there was damage to the cropland and damage to the land, I believe, that would have been remedied by taking's damages if it had risen to the level of a taking. You think the government would be better off with a tort claim? You then might have much larger damages. Well, it's possible. To be fair, I don't know if they could bring a tort claim now because the statute of limitations might have run, and for other reasons. Is your position there's no remedy if there's no taking? There may have been a tort remedy at one time. I'm not sure if there's one now, but it seems unlikely. If there's no taking, then there's no taking. That's the claim they have pled here in the claim that was tried. And the reason there's not a taking is because the flooding here, even if we accept the facts as found by the Court of Federal Claims, just didn't rise to the level of an appropriation of the land. It was a marginal increase in flooding. There's no dispute in the record that the land flooded regularly before the Corps started deviating for the 1993 to 2000 period. The land flooded regularly. The record is a little jumbled on exactly how much of an increase there was. The Court of Federal Claims looked at it a few different ways, but one of the ways shows there was an eight and a half day increase in flooding during the key growing months, comparing the decade or so before the deviations to the deviation period. That seems to be a somewhat different question, and that is whether it was substantial enough, but in terms of whether it went on for enough years, what strikes me is it would be difficult to say that if this had started out as a permanent policy with respect to the operation of the dam, that might well be within the cases that say that it's a taking. But if I understand correctly, this started out as an interim policy that was reconsidered every year, and it wasn't adopted as a permanent policy with respect to how the dam was going to be operated. Indeed, this was viewed, as I understand it, as a temporary deviation, which was being considered on an interim basis from what was originally a policy that isn't being challenged here as being a taking. That's right. Every year the deviations were, the Corps decided whether to deviate or not. They started in 1993. They ended in 2000. They considered a permanent change and rejected it. The deviations that are now, the releases that are now in place are governed by a 1953 water manual. That plan is still in place now. In the last two years, 99 and 2000 of the deviations did not have any practical impact because they were drought years, and the deviations did not change the pattern of releases. So it's no doubt that these are intermittent and not inevitably recurring floodings, even accepting that there was more flooding. Suppose it had been a permanent policy. Suppose that in the first year in question here they'd said, okay, here's our existing policy. We're now changing this on a permanent basis to provide for these release rates. Would that have made a difference? I don't know if it would have made a difference at the end of the day. It clearly would be a factor then. That would be closer to a taking than we are here. There's no doubt that that would weigh in favor of finding a taking. I don't know with the marginal increase if it would be a null for not, but it would be different. That's a trouble for me. If you have a deviation and it makes a difference for six out of eight years or whatever it was here, eight out of eight years, would that put it over the line? I don't think so. It would make it closer to the line. There's no doubt that this inquiry is a line-drawing exercise. If you look at the Supreme Court cases and the Ridgeline test that the Federal Circuit has set forth, you have to look at the whole ball of wax and decide whether it becomes an appropriation of land or it's just injury to land. If it's just injury to land and property, it doesn't make that next step of an appropriation, then it's not going to make it. I think the eight years is a key factor here. The fact it was a marginal increase was a key factor here. The fact that it was only during these growing months, and if you look at the data, there was sometimes more and sometimes less, and that it was unanticipated by the Corps when it started these deviations. If you add those all together, I think that's the proper way to look at it. They were certainly told during the course that it was causing damage. Excuse me? They were certainly told during the course of the time that these deviations were taking place that it was causing damage. They were told starting, I believe, in 1996, the Commission asserted damage. The Corps talked to the Commission. By 1999 and 2000, there were, I think, further discussions. The Corps at that point was considering whether to make this change permanent or not, and the Corps decided that there were potential environmental impacts it would have to analyze under the National Environmental Policy Act before doing so, and so decided to go back to the old regime and no longer deviate by year. Is foreseeability a requirement no matter how significant the damage is? I think it is, no matter how significant the damage is. So if something was completely unforeseeable to the Corps and had imposed one day of flooding that was not foreseeable at all, had imposed significant damages, a million dollars of damages, that would not be a taking. It might be a tort, but not a taking. I think the record here underscores that the Corps, you know, these deviations were requested. The Corps considered them. The dam is more than 100 miles upstream from the Commission's land. This is not a situation where the dam is right next to it or even nearby at all. The Corps anticipated at the time, and the record shows this, that there would be no impacts below the Missouri-Arkansas state line. The Commission's land, of course, is below that line on the Arkansas side, and then started the deviations. And I think what underscores the foreseeability is even when you look back after the fact, we are arguing now about whether there was a taking and exactly how much increased marginal flooding there was or was not. There's no doubt that before 93, the Commission's lands regularly flooded during the summer months, and there's some back and forth about exactly how many days, but it wasn't a situation where these lands were dry June, July, and August, completely dry, and then the deviations occurred, and then there was water. Instead, they were already wet, and the question is, did they become more wet, and is that enough? And we submit it's not enough. Trees didn't die before, did they? Excuse me? Trees didn't die before, did they? Well, they did. I mean, the question is at what rate and how many. And, you know, their claim is that the death of the trees, and their focus is on that damage, and that's enough to show a taking. It shows a damage, but you can't just say trees die and tree death is enough. There has to be a taking that's based on an appropriation of land, and that's what Sanguinetti says, that's what the other Supreme Court cases say, and that's what this Court very clearly in Ridgeline set forth, that damage to property alone is not enough. You need to have that appropriation, that the government has done something that in effect appropriates your land. So is your theory that the fact that the court ignored the warnings from the state for several years is irrelevant? I do not think it's irrelevant, but I don't think the court ignored the warnings. The court talked to the state about this. The state and the court together in, I think, 2001 participated in a test where they raised the level to a certain level. I think it did not work in 2000 and 2001. They did get the level to where they wanted it to be to see if that then impacted the lands or not. Well, it showed that they were correct in the earlier warnings, which were not adopted, but does it matter in a takings case whether there was misjudgment, negligence particularly, but a decision which turned out to be incorrect because I think it's undisputed that the injury to the trees and to the land was sufficiently directly related to the flooding that it isn't being challenged. So in trying to focus on, it's really a no fault kind of law, isn't it, that if a legitimate government operation for a legitimate purpose, no one has ever said otherwise, nonetheless causes injury sufficiently directly, no one says this was an act of God that caused the trees to die. Isn't that enough to bring it within the Fifth Amendment? I don't think that misjudgment is enough, and the Sanguinetti Supreme Court case is very clear on this. There are cases on all sides, on all facts, going in all directions, depending on the facts. There's no doubt that this is an inquiry that turns on all the facts in the case, but in Sanguinetti, just like here, there was a misjudgment at most in building a canal. The government thought that the canal would be big enough. It turned out not to be. Flooding resulted over a period of several years. It was an increase in flooding of land that already flooded, and the Supreme Court said, no, that's not enough for a taking. You may have some other claim for damages, but you don't have a taking claim. Isn't Sanguinetti a little different, though, because Sanguinetti was the government just didn't build a big enough dam, whereas here they changed a policy that caused an increase in flooding? I mean, I think that is the difference. I don't think it is a difference that makes a difference here because in both cases the government looked at the problem in advance, did not anticipate flooding here, did not think it would flood 100 miles downstream south of the Arkansas line. I'm having difficulty understanding what the foreseeability has to do with this. I would have thought that the key here was the permanency or the long-term nature of what the government was doing when you're trying to distinguish between a court and a taking and not the whole foreseeability thing. Foreseeability, as Judge Newman suggests, might be much more relevant to a tort claim. Foreseeability is not something we usually look for in a takings claim. So isn't the key thing here whether when this was started it was going to be something that was a long-term permanent effect as opposed to sort of an interim year-by-year policy? I think that's right. The key fact here is that the outset, this was a yearly deviation. They did the deviations for eight years, only had any arguable impact in six of those years, and then stopped. And that is not a permanent invasion of land. The Supreme Court in Loretto and in Sanguinetti said that that's what we're looking for to determine whether it's a taking or not. All right, let's hear from the Commission. We'll save you a rebuttal. Okay, thank you. Ms. Greathouse. May it please the Court, my name is Julie DeWitty Greathouse, and I represent the Arkansas Game and Fish Commission, who is both the appellee and cross-appellant, and I'd like to reserve two minutes for rebuttal on the cross-appeal. The trial court The difficulty here in distinguishing between a tort and a taking comes down to a number of these cases. And you look at Sanguinetti and you look at Florence, and in those cases held that a few years isn't enough. And why is a few years here sufficient in the light of Sanguinetti and Barnes? Your Honor, it's my understanding that in Barnes, after a few years they did say it was enough. It had been sufficient, substantial and frequent enough to constitute a taking. Well, not really. What happened in Barnes was that the initial period before the permanency of the invasion became clear, 1969 to 1973, the Court said, no, no, there's no taking from 1969 to 1973. The taking only occurred in 1973 when the permanent nature of this became obvious. So Barnes would seem to be rather in point, rather like this, that until the permanent nature of it became obvious, there wasn't a taking. Your Honor, clearly a permanent taking under the law, a permanent occupation is a taking. But the law also allows for a taking under more temporary circumstances. How do you distinguish Barnes? In Barnes, the Court said, our Court, or our predecessor Court, I guess, said that there wasn't any compensable taking from 1969 to 1973 because during that period it wasn't clear that this was going to be a long-term problem. And the same thing seems to be true here. So how do you distinguish Barnes in that respect? The way I would distinguish, Your Honor, is to talk about the facts in this case, and that is that these were deviations put in place for a number of years and the United States intended to make them permanent and only after they finally performed studies to verify what the Game and Fish Commission had been telling them was true all along did they decide not to make them permanent. It doesn't – They did do that. I'm sorry. But in the beginning they were temporary. They weren't viewed as permanent, right? The government still appropriated the use of the property. No, this is my statement correct. In the beginning they were viewed as temporary. They were trying to decide whether to make them permanent. In the beginning they were done, yes, at the request of specific interest to benefit another interest for a specific purpose but not to benefit the commission. So during the period we're dealing with they never were adopted as a permanent policy? At some point, and I can't recall as I stand here, but I believe it's in the record, the specific year, at some point the Corps did discuss making this permanent. It was during the 1999 period. Discussed making it permanent, but they didn't make it permanent, right? They didn't make it permanent because they couldn't support it under the environmental analysis that had to be performed, which had to show there was no significant impact. Okay, so how do we distinguish this from the Barnes case? If during this period they hadn't decided to make it permanent and they were trying to decide whether it would be permanent or not, why isn't that like the 1969 to 1973 period in Barnes where the permanent nature of the thing hadn't become apparent? Your Honor, Barnes looked at both whether it was frequent enough at some point to be deemed a taking and whether it caused substantial damage. But I'm right that there was no compensation for 1969 to 1973 because the permanent nature wasn't evident yet, right? What the Court determined was that the flow adjustment, yes, was taken in 1973. And there was no compensation from 1969 to 1973 because during that period it hadn't yet been… And I don't know that that doesn't relate… Wait a minute, wait a minute. I'm sorry. It hadn't yet become permanent in nature, right? Well, in that case, Your Honor, what the plaintiffs asked for some asked for flow adjustment and some asked for the destroyed crops after the fact. Those were the damages requested. I don't think we can assume that based on that there could have been no damages prior to that. I don't think the law requires it to be permanent or that the government intend at the time that it begins to make it permanent. What's your best case that holds that it doesn't have to be permanent and the government doesn't have to intend it to be permanent? The Barnes case is one. The Kress case is another. It's a non-permanent injury, a non-permanent flooding in that case. Those cases, it was subjected to overflow and it was a non-permanent flooding. It diminished the value of the land only by half and it was found to be compensable. So I think Kress is instructive on that point. Isn't there a difference here that when the Oak trees died that this was an irreversible step, an irreversible step like the overall flooding? It is, and the United States in its briefing has attempted to divorce the injury from the actions, and it simply can't be done. The destruction itself can be a taking if it rises to the level of a taking instead of a tort. So what do you think the test ought to be in distinguishing between tort and a taking? Well, there are many factors laid out in the law. In this case, I would say there are several. Lana and Armstrong point to a couple that the government knew it wasn't their property and that they took action only they could take. In this case, over the Game and Fish Commission's objections, for a period of consecutive years, and as a result destroyed millions of dollars and four feet of timber. But you've got the same number of years and the same amount of barns, and that's not sufficient to make it a taking until it goes on longer. In terms of the number of years, what role in the number of years does the permanency of the thing have to do with it? The fact that what happened here was that the United States abandoned its easement only makes it temporary, but the damage that resulted was permanent, and the experts in this case agree that that damage began to result after three or four years. The literature supported that. So any damage is a taking rather than a tort? No, I don't believe that it is. What would be an example of a tort? If the government, through its negligence, operated Clearwater Dam in such a way that it caused incidental flooding on the Game and Fish Commission's property, that would not be compensable. How many years could it go on before it became a taking? I don't know that I can answer that question specifically. I believe in this case six consecutive years of growing season flooding, which is an important time of year for these trees, was enough to affect a taking. And given all the other factors in this case, it rises to the level of a taking and is not simply a tort. Did you view the Cooper case as closest on its facts to your situation? Cooper is instructive, Your Honor. There was a flow easement taken in that case. No, no, no. The court held that there wasn't a flow easement taken in that case. It specifically said that. I'm sorry. In the Cooper case, there was a flow easement taken. They just didn't seek compensation for it. I believe that was the court's finding. They didn't say that there was a flow easement taken. The court's finding. The court said there may be a flow easement. They didn't say that a flow easement was taken. And in any event, it was not an element that had to be proved in that case, at least the court said. The court did find a flow easement occurred here and a taking of timber as well. What are the facts of Cress? In the Cress case, Your Honor, there were two plaintiffs whose lands had flooded only occasionally before, and as a result of a new dam backed water up, it was subjected to more frequent overflows, reducing the value of the land by half, and that was found to be intermittent but inevitably recurring so that it constituted a permanent liability and affected the taking of the property. Isn't that distinguishable from this case in the sense that in Cress there was an inevitable recurring overflow? In the Cress case, I believe it was subject to frequent overflows. If I recall correctly as I stand here, I don't think those overflows were the same every year, but the court at some point found they were sufficiently recurring to constitute a taking in that case. Whether they would continue every year thereafter to the same degree I don't believe was established. That really isn't a case that stands for the proposition that a temporary taking is,  Well, I believe that it does because I don't think what the law says is that it has to be permanent. That's what I'm trying to find out. What case best supports the proposition that it doesn't have to be permanent? The government appropriated an interest when it used our property. The fact that it abandoned that doesn't mean it never had an interest at all. Yeah, but what case? The appropriation cases, Your Honor, which are cited in our... Temporary, it involved a temporary... Dickinson is one of those cases. It was intermittent but inevitably recurring, and I don't believe that was a permanent taking. Inevitably recurring, that's the permanent nature of it. Well, that was found to be not a permanent taking in that case is my recollection of the facts of that case. So Dickinson would be on point. And I believe there are other cited in our brief as well. If I could, Your Honor, I'd like to turn to, for a few moments, to our cross appeal on regeneration damages, and I'll answer any other questions that the court... Are there any more questions on the principle appeal? Okay, let's move to the cross appeal. The trial court in this case got it almost exactly right when he made its award, but went astray when it only awarded a portion of the regeneration damages for 349 of the most severely damaged areas. The evidence in this case was sufficiently definite for all 6,990 acres. The witnesses gave testimony that for all 6,990 acres, the conditions were described. There were various degrees of either no nut all and over cup oaks left in the severe areas, no nut all oaks and some over cups left in the heavy, and nut all oaks being mostly gone from the moderate and being replaced by over cup oak. The Kingwood Forestry Services, which had a report which was relied on by Mr. Blaney, who said that the nut all to over cup ratio was mostly dominated by those two species, with it being primarily dominated by nut all oak. And that composition has changed, the under story has changed as a result of this flooding, and all testimony in this case was that both the need to restore the property and the cost to do it were sufficiently presented for all 6,990 acres. The court held the commission to a higher standard than it should have, requiring both the approximation and the fact of damages. Though he cited to the correct standard in the first third bank case, he held the commission to a higher standard when he required certainty in the approximation or the assignment of a number to the damages in the case. He also used his site visit viewing to create a gap in the proof. What's the purpose of a site visit if you can't consider what you see? And if he were considering it to resolve conflicting testimony or to determine the credibility or weigh disputed evidence, then that would make sense, but in this case there was no conflicting evidence. He thought the witnesses and the evidence presented to be credible, because we know that because he used it to award damages on 349 acres. So there was just simply nothing about the court's viewing of the site in this case that could have allowed him to determine need or make a more reasonable approximation of the damages. We believe the court clearly erred in finding that these damages should not be awarded on the 6,990 acres and instead only awarding it for 349. You don't think that's just a judgment call? I'm sorry? You don't think that's just a judgment call? I think based on the evidence before the court and in this record, there was no other judgment to be made. It was consistent among all the acres that restoration was both needed and the amount. Thank you. Okay, thank you Ms. Greathouse. Mr. Langevin? The first point I want to mention was the deviations every year were not the same. The court put in place different deviations. They were not uniform. They were reconsidered. I think that goes to the fact that they were not permanent. Judge White asked if there were dead trees beforehand. I don't think I answered that very well. There were. Our brief compiles the evidence showing that there were flood damage already before 1993, insect damage, beaver dam related damage, and that that damage was found throughout the wildlife management area. That relates to our second argument on appeal that the loss of the cruise maps that were used to generate the timber assessment damage greatly prejudiced the government's ability to test or even to know where the damaged trees were. So we could not compare if the damaged trees were located in the same area as the preexisting damage or were located somewhere else. Don't you have to rely on the trial judge to make a call as to whether or not the loss of that evidence was prejudicial to your case? In general, yes. At some point it rises to the level at which we were too hamstrung and that evidence was just too important. They're saying they're damaged and dead trees. We can't assess whether those trees are at a higher elevation that would not have flooded or were somewhere that were damaged in 1992 before the deviation started. We'll just back up a moment. If I understand what happened here, these forestry people staked out one-fifth acre plots as they went along and measured the trees and the damage to the trees in the one-fifth acre plots, right? I believe they, right, yes. Did the cruise map show where the fifth acre plots were? In other words, does the cruise map show the path that they took in staking out these fifth acre plots? I believe the maps would have shown where the plots were, the path they took within the plots, yes. And then within the plots, here are the damaged trees, XXX. And then we could have said, oh, the damaged trees are right where they were damaged in 1992 or the damaged trees are on top of a ridge of a few feet that may not have flooded at all due to the deviations. Did anybody try to reconstruct what one of these cruise maps would look like in the record? I don't recall seeing in the record what a cruise map looks like or what a reconstructed one would have looked like. Did the government offer contrary evidence as to what the damage in that area might have been? Well, the government offered contrary evidence as to the amount of damages. Contrary evidence as to the raw data, or did you just complain that because the original data no longer existed, none of this evidence could be admitted? Well, we didn't just complain. There was data we put in on tree core data, et cetera, that we have not raised on appeal showing that the damages were not, as the commission claimed. But the problem was... You're saying the issue you're now raising is not before us? I'm not raising that issue. I didn't want to answer no because we did, but we're not raising that issue. So I'm not... It's a non sequitur, I think. You're raising a new word. I am not raising it. The point I would like to make is these cruises were conducted in 2000 and 2001. The cruise maps were lost at that point. They did not see us until 2005. Sometime later it became apparent these things were missing. By that point, the deviations had in effect stopped in 1998, some seven, eight years earlier. There was no way to go back eight years later and do our own timber assessment cruise and determine where the damaged trees were located as of 2000. It was seven, eight years later. It was too late. To be sure I understand your point, you're saying that the expert testimony, the evidence that was submitted must be rejected because the original data didn't exist. Right. Rule 26 requires that the expert produce the underlying data. You didn't provide contrary expert evidence or anything else suggesting that the expert's conclusion was wrong. Well, there's two parts. Answer that question. I'll try again. We did produce that evidence. We're not arguing it on appeal. We're arguing that the error here was the failure to exclude the evidence. Again, trying to see what line you were trying to draw before us. The three more points I'd like to make about the first just briefly about the Barnes case. I'm quoting here, the permanent intermittent flooding, which amounts to a taking, must be frequent. Quote continues, and the flooding is of a type which will be inevitably recurring. And that inevitably recurring is the language from Cress. We talked about Cress briefly. It requires it be permanent and inevitably recurring. Those words are in the Cress opinion. And the concept of damage alone, whether the damage itself is temporary or permanent, that's not enough under the court's test of Ridgeline. And one more point. I see my time is up. Under Cooper, the court just finds the damage is enough. And we've explained in depth in our brief why Ridgeline and the other cases require much more than that. So unless the court has any further questions, we ask that the judgment be reversed. That was great. I didn't respond on the cross appeal, so I think there's no rebuttal appropriate. Thank you. Thank you both. The case is submitted. Thank you.